1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

QUINN EMANUEL URQUHART & SULLIVAN, LLP
   James D. Judah (Bar No. 257112)
   jamesjudah@quinnemanuel.com
   Darice Xue  (Bar No. 343685)
   daricexue@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:     (415) 845-6600
Facsimile:     (415) 875-6700

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLUESTONE INVESTMENT INC., WORLD EDUCATION ASSOCIATION, INC., IRENE CHAN, LISHAN ZHANG,<br><br>Plaintiffs,<br><br>v.<br><br>QIZHONG HU, PATTEN HOLDING LLC, PATTEN UNIVERSITY, LLC, JPMORGAN CHASE BANK, N.A., ANDREW BABES, JINGLING LI, WILLIAM SAWYER, SCOTT ETHAN VICTOR, and DOES 1-25, inclusive,<br><br>Defendants. | CASE NO.  3:25-cv-5396<br><br>**COMPLAINT FOR:**<br><br>**1. Securities Fraud**<br>**2. Fraud**<br>**3. Breach of Contract**<br>**4. Receiving Stolen Property**<br>**5. Conversion**<br>**6. Aiding and Abetting Fraud**<br>**7. Conspiracy to Commit Fraud**<br>**8. Negligence**<br>**9. Negligent Misrepresentation**<br><br>**DEMAND FOR JURY TRIAL** |

For their Complaint against Defendants Qizhong Hu, Patten Holding LLC, Patten University, LLC, JPMorgan Chase Bank, N.A., Andrew Babes, Jingling Li, William Sawyer, Scott Ethan Victor, and Does 1-25, inclusive.  Plaintiffs Bluestone Investment Inc., World Education Association, Inc., Irene Chan, and Lishan Zhang, by and through their undersigned attorneys, allege as follows:

## INTRODUCTION

1.      This litigation stems from a wide-ranging fraud and misappropriation scheme orchestrated by Qizhong "Tony" Hu ("QZ").  With the assistance of several accomplices, and taking advantage of the global pandemic that prevented China-based investors from conducting in-person diligence, QZ used a complex web of fabricated diligence materials and forged agreements to solicit investments of more than **$35 million**.

2.      The ostensible securities being offered by QZ were shares in Patten University, a small college based in Oakland, California (originally founded in 1944 as Patten Bible College).  QZ provided falsified financial and due diligence reports from reputable U.S. firms – including PricewaterhouseCoopers – to grossly overstate Patten University's enrollment, revenue, and financial condition.  However, the crux of the scheme was a purported joint venture that Patten University had secured with Stanford University, which QZ called the "**Patten-Stanford United College**."  QZ and his confederates "guaranteed" the validity of Patten's purported relationship with Stanford to induce Plaintiffs to execute the stock purchase agreements, and then forged signatures from key Stanford officials – including then-Stanford President Marc Tessier-Lavigne – in order to perpetrate their fraud (the "**Patten-Stanford United College Scheme**").

3.      QZ's accomplices in the Patten-Stanford United College Scheme included Patten University and two of its officers, as well as JPMorgan Chase Bank, N.A. ("Chase") and one of its private wealth managers – who willfully permitted QZ and his mother to open, access, and control Plaintiffs' corporate bank accounts in violation of Chase's policies and legal obligations.

4.      Due to QZ and his accomplices' extensive fraudulent concealment of their misconduct – which continues to this day – it was only in the summer of 2023, after COVID restrictions were lifted in China that Plaintiffs were able to travel to the United States to seek the return of the investment funds.  It was during that visit in July 2023 that they first discovered the possibility that the Patten-Stanford United College Scheme was based on lies and fraud.

5.      Through this action, Plaintiffs seek to hold QZ and his accomplices accountable for their malicious and unlawful conduct and to recover the significant and ongoing damages they have incurred as a result.

### THE PARTIES

### Plaintiffs Zhang, Chan, Bluestone, and WEAI

6.      Plaintiffs Lishan Zhang ("Zhang") and Irene Chan ("Chan")[1] are investors and entrepreneurs residing in China.  Their focus is on education technology and services, and in particular on providing opportunities for Chinese students to study in the United States and obtain degrees from American universities.

7.      Plaintiff Bluestone Investment, Inc. ("Bluestone") is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in California.  At all relevant times, Plaintiff Zhang has been the President and principal shareholder of Bluestone.

8.      Plaintiff World Education Association, Inc. ("WEAI") is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in California.  Plaintiff Chan is the President of – and has at all relevant times been an officer and principal shareholder of – WEAI.

9.      Bluestone and WEAI were created as vehicles to facilitate Chan's and Zhang's investments in Patten University.

---

[1]  Plaintiff Chan's name in Chinese (her native language) is Yuting Chen.

- 3 -

1

2

**<u>Defendants QZ, Patten Holding, Patten University, Li, Sawyer, Ethan,</u>**

**<u>Chase, and Babes</u>**

3      10.      On information and belief, Defendant Qizhong Hu ("QZ") is an individual

4   residing in Walnut Creek, California, and is the Managing Partner (and alter ego) of Patten

5   Holding LLC.

6

7

8

9

10

11

12

13

14

15

16



17

**Qizhong "Tony" Hu ("QZ")**

18      11.      On information and belief, Defendant Patten Holding LLC ("Patten

19   Holding") is a limited liability company organized and existing under the laws of

20   Delaware with its principal place of business at 2433 Coolidge Avenue, Oakland, CA

21   94601.  On information and belief, Patten Holding is an alter ego of QZ that was created

22   for purposes of furthering the Patten-Stanford United College Scheme.

23

24

25

26



27

**Patten Holding Logo**

28

12.    On information and belief, Defendant Patten University, LLC ("Patten University") is a limited liability company organized and existing under the laws of California, with its principal place of business at 2433 Coolidge Avenue, Oakland, CA 94601.  On information and belief, Defendant Patten University is a wholly owned subsidiary of Patten Holding and operates the university known as Patten University, which was founded as Patten Bible College in 1944.



**Patten University Logo**

13.    On information and belief, Defendant Jingling Li ("Li"), also known as Lingling Hagus, is an individual residing in San Ramon, California, and is QZ's mother.

14.    On information and belief, Defendant William Sawyer ("Sawyer") is an Adjunct Vice Dean at Patten University and Managing Partner at Patten Holding.  On information and belief, he is also a licensed Certified Public Accountant and former private investigator.



**William Sawyer**

- 5 -

15.    On information and belief, Defendant Scott Ethan Victor ("Ethan") is a Vice President and Board of Directors Representative at Patten University.  On information and belief, Scott Ethan's real name is Scott Ethan Victor, and he was suspended from the Rocklin Unified School District in Placer County, California, in 2016 pending disciplinary action (and has never been reinstated).



**Scott Ethan (aka Scott Ethan Victor)**

16.    On information and belief, Defendant JPMorgan Chase Bank, N.A. ("Chase") is a national banking association organized under the laws of the United States, with its main office in Ohio, as designated in the articles of association of Chase.



**Chase Logo**

17.    On information and belief, Defendant Andrew Babes ("Babes") is an individual residing in Danville, California, and has been at all relevant times employed by

Chase as a Business Relationship Manager.  On information and belief, Chase recognized Babes as an "Outstanding Performer" in 2022 and 2023 and as a "National Achiever" in 2020 and 2021.



**Andrew Babes**

18.    Plaintiffs do not presently know the identities or involvement of Defendants named herein as Does 1-25, inclusive, and therefore refer to them by such fictitious names. Plaintiffs will seek leave to amend the complaint to specify the identifies and involvement of such Doe Defendants when ascertained.

## JURISDICTION, VENUE, & DIVISIONAL ASSIGNMENT

19.    This Court has subject matter jurisdiction over Plaintiffs' federal claim for securities fraud under the Securities Exchange Act of 1934 ("1934 Act") pursuant to 28 U.S.C. § 1331.  The securities fraud claim asserted herein arises under § 10(b) of the 1934 Act (15 U.S.C. § 78j et seq.) and Rule 10b-5 (17 C.F.R. § 240.10b-5).  This Court has supplemental jurisdiction over the remaining claims for relief pursuant to 28 U.S.C. § 1367(a).

20.    The Court has personal jurisdiction over all named defendants because the claims alleged by Plaintiffs in this complaint arise from illegal acts committed within or purposefully directed toward California by each named defendant.

21.    A substantial part of the events giving rise to the claims alleged in this Complaint occurred in this District.  Venue is therefore proper in this District under 28 U.S.C. § 1391(b)(2).

COMPLAINT

22.    For purposes of divisional assignment under Civil Local Rules 3-2(c)–(d) and 3-5(b), this action may be assigned to the San Francisco Division or to the Oakland Division because a substantial part of the events giving rise to the claims alleged in this Complaint occurred in in the Counties of Alameda and Contra Costa.

## FACTUAL ALLEGATIONS

## QZ Pitches the Patten-Stanford United College Scheme With Fabricated Diligence Materials

23.    Plaintiff Irene Chan is an investor and entrepreneur currently based in Shenzhen, China, dedicated to the field of international education.  This is an established and rapidly growing market in China, where many students aspire to study at U.S. universities to gain a deeper understanding of Western culture and values.  Chan and Plaintiff Lishan Zhang both help Chinese students pursue advanced education in the United States, and are also committed to introducing the higher education resources of U.S. universities into China, which enables Chinese students to access truly world-class, Western education.  Chan has experience with innovative companies in this space,  helping connect Chinese students with U.S. colleges and universities.

24.    In October 2017, Chan was introduced by mutual connections to Defendant QZ, who was visiting China from the United States.  QZ claimed to be a board member of Patten University, on whose behalf he was seeking investments in exchange for equity stakes of up to 51%.  Chan declined to invest at that time, in part because Patten University is essentially unknown in China, unlike internationally recognized universities like MIT or Stanford.

25.    After QZ returned to the United States, he continued to inquire with Chan about a potential investment in Patten University, including at various times in 2018 and 2019.  Chan again declined to invest, again because (among other reasons) Patten University lacked international prestige.  These (and subsequent) communications were

primarily conducted over WeChat in Mandarin, which is Chan's native language (although there were also multiple Zoom calls between QZ and both Chan and Zhang).

26.    In 2020, QZ continued to pitch Chan on a potential investment in Patten University.  He now indicated that Patten University was planning to go public with an Initial Public Offering (IPO), and he offered to provide due diligence materials that would demonstrate the value of the investment.  At this point, Chan began discussing the potential investment with a family friend and fellow investor, Plaintiff Lishan Zhang, although both were still skeptical – not least because (as Chan had explained repeatedly) Patten University is an obscure college with no brand-name recognition in China. Moreover, Chan was most interested in making investments that would offer synergies with her other ventures, such as education services connecting Chinese students with American study programs and degrees.  Finally, both Chan and Zhang's prior investment experience had been in China and conducted in Chinese, and they had concerns about their ability to conduct diligence into an investment into an American university – particularly in light of the COVID-19 pandemic, which locked down the entire country and made travel to the United States impossible.

27.    It was at this stage that QZ announced a new development that he assured Chan and Zhang would resolve their concerns: they would not only be investing in Patten University, but also in Patten's forthcoming collaboration with Stanford University, called the **Patten-Stanford United College**.  This joint venture would include a satellite campus – also called the "Patten Stanford Node" – as well as two joint laboratories in Shenzhen, China.  QZ assured Chan and Zhang that he had several close contacts at Stanford, including then-President Marc Tessier-Lavigne, whom he described as a personal friend. Moreover, QZ promised Chan that as part of the investment she would have the option to become the exclusive recruitment provider for both Patten University and the Patten-Stanford United College for all of China.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Logo Sent by QZ - Patten-Stanford United College**



**Photo Sent by QZ –**

**Center: Stanford President Marc Tessier-Lavigne; Right: QZ**

28.    QZ also began sending purported financial statements and diligence materials related to the investment.  On information and belief, these materials were fabrications and forgeries and contained brazen misrepresentations intended to induce Chan and Zhang into investing in the Patten-Stanford United College Scheme.

29.    On or about February 13, 2021, QZ sent Chan via WeChat[2] a "Valuation Analysis" ("PU_Valuation_Cert_PE.pdf") for Patten-Stanford United College purporting to come from PricewaterhouseCoopers (PwC) (the "**PwC Valuation Analysis**").



**PwC Valuation Analysis – QZ WeChat Message**

30.    The PwC Valuation Analysis was branded with a PwC logo, and designated in a footer as "Confidential Information for the sole benefit and use of PwC's Client."  On information and belief, this document was a forgery that was not created by PwC.



**PwC Valuation Analysis – PwC Logo**

31.    The PwC Valuation Analysis provided, *inter alia*, a "Valuation Summary," based on a purported "DCF" (discounted cash flow) analysis, of over $51M, and culminated with a "Recommendation" of "**BUY**" (in all caps):

---

[2]    QZ's WeChat ID is "wxid_bsatk6onj1p12," and his WeChat profile name is "SpicyKing."

**PATTEN-STANFORD UNITED COLLEGE | CERT PRO**
**Valuation Analysis of PATTEN-STANFORD UNITED COLLEGE | CERT PRO**
**Valuation Summary**

As of December 21, 2020
$

| Valuation | Weight | Estimate |
|---|---|---|
| DCF | 50% | $ 51,148,121 |
| Market Multiple | 50% | 56,806,911 |
| | | |
| **Target Price** | | $ 53,977,516 |
| **Trading Price** | | |
| **Recommendation** | | **BUY** |

**PwC Valuation Analysis – Valuation Summary**

32.     On information and belief, these and other representations in the PwC Valuation Analysis were false and/or misleading and were intended by QZ to induce Chan and Zhang to invest in the Patten-Stanford United College Scheme.

33.     On or about April 11, 2021, QZ sent Chan via WeChat a "Consolidated Financial Statements and Independent Auditor's Report" ("PU FY 2019 C2 012.pdf") for Patten University and Patten Holding as of December 31, 2019, purporting to come from the Los Angeles-based accounting firm Holthouse Carlin & Van Trigt LLP (HCVT) (the "**HCVT Auditor's Report**").



**HCVT Auditor's Report – QZ WeChat Message**

34.     The HCVT Auditor's Report was branded with HCVT logos and purportedly signed by Holthouse Carlin & Van Trigt LLP.  On information and belief, this document was a forgery that was not created by HCVT.

**HCVT Auditor's Report – Logo**

35.     The HCVT Auditor's Report purported to provide income statements for fiscal years 2019 and 2018, with an auditor's "Opinion" that "the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of the Company as of December 31, 2019 and the results of their operations and their cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America."  These Income Statements purport to show that Patten University had over $9M in revenue, and over $7M in "Gross Profit" in FY 2019, with "Total Assets" in excess of $37M.  On information and belief, these and other representations in the HCVT Auditor's report were false and/or misleading, and were intended by QZ to induce Chan and Zhang to invest in the Patten-Stanford United College Scheme.  On information and belief, in FY 2019 Patten

University's actual financials were a mere fraction of these numbers, with total revenue of well under $2M and total assets under $5M.

36.    On or about April 16, 2021, QZ sent Chan via WeChat an "Income Statement" ("Income Stmt 2020 PU.pdf") for Patten Holding / Patten University, purporting to show unaudited financials as of December 31, 2020 (the "**Patten Income Statement**").



**Patten Income Statement – QZ WeChat Message**

37.    The Patten Income Statement purports to show that Patten had over $12M in Net Revenue in FY 2020 and Gross Profit of over $10M, despite the impact of COVID-19. On information and belief, these and other representations in the Patten Income Statement are false and/or misleading and were intended by QZ to induce Chan and Zhang to invest in the Patten-Stanford United College Scheme.  On information and belief, in FY 2020 Patten University's actual financials were less than 10% of these numbers, with total revenue under $1M.

38.    On May 14, 2021, QZ sent Chan via WeChat a 50-page "Patten University Due Diligence Report" ("Mackey PU e-Report 2021.pdf") purporting to come from Bay Area law firm Leland, Parachini, Steinberg, Matzger & Melnick LLP ("LPS") (the "**Patten University Due Diligence Report**").

1
2
3
4
5
6

2021年5月14日 12:25

MacKey PU e-Report c1 01.pdf
6.4M

尽调报告IR-中文翻译 copy.pdf
5.1M

Hi Irene，出尽调报告的律所可以不是过Purchase Agreement的律所。

最佳的选择应该是找一个比较小的律所，全权搞定。

7    **Patten University Due Diligence Report – QZ WeChat Message**

8      39.      The Patten University Due Diligence Report was branded with an LPS logo,

9  designated "confidential" as prepared "at Client's direction and exclusively for Client's

10  sole benefit and use," and purportedly signed by LPS.  On information and belief, this

11  document was a forgery that was not created by LPS.



**Patten University Due Diligence Report - Header**

23
24
25
26
27
28



**Patten University Due Diligence Report – LPS Logo**

This report and LPS's Services are confidential and access, use and distribution are restricted. The Services were performed, and this report prepared, at Client's direction and exclusively for Client's sole benefit and use. The Services and report may not be relied upon by any person or entity other than Client. LPS makes no representations or warranties regarding the Services or this report and expressly disclaims any contractual or other responsibility or liability to any person or entity other than Client. If you are not Client, or otherwise authorized by Client and LPS, you may not access or use the Services or this report.

The services and this report shall be maintained in strict confidence and may not be discussed with, distributed or otherwise disclosed to any third party, in whole or in part, without LPS's prior written consent, nor may the services or this report (or contents thereof) be associated with, referred to or quoted in any way in any offering memorandum, prospectus, registration statement, public filing or other agreement.

LELAND PARACHINI STEINBERG MATZGER & MELNICK LLP
February 10, 2021

**Patten University Due Diligence Report – LPS Signature**

40.    The Patten University Due Diligence Report represented, *inter alia*, that Patten University had over 3,000 registered students:

## Overview of Education and Operations

· The university's teachers have a good background, and the salary is average. At the same time, Patten university has also hired teachers from famous universities to carry out master classes on a regular basis.

· The university staff has no criminal record for the past 10 years.

· The university's education is mainly based on online degree programs. The current number of registered students is about 3,000, including 2,400 postgraduates, 100 junior colleges, 70 undergraduates, and 500 non-degree certification programs.

· The university reported that due to the temporary closure of some facilities in the main campus due to the epidemic, the number of offline degree programs has been reduced to 70.

· The list of professors is shown in Appendix 1.

**Patten University Due Diligence Report – Overview of Education and Operations**

COMPLAINT

41.    The Patten University Due Diligence Report also referenced the PwC Valuation Analysis, suggesting that LPS had reviewed the PwC Valuation Analysis and considered it a legitimate analysis from PricewaterhouseCoopers.



## Historical and Future Financials

· Listing Plan
  o Securities brokerage trading companies and investment banking advisory services registered by the US Securities Regulatory Commission provided the school's listing cost expectations. According to PwC's proposed maximum price adjustment of about 20%, the overall estimated listing cost will be $8 million~ Between 9 million.
  o The basic capital reserve for listing preparation meets the minimum requirements for listing, but the risk of additional costs incurred in the process needs to be controlled.
  o The listing process is relatively complicated. If the listing plan cannot be completed temporarily due to economic environmental factors, other plans for the development of the capital market need to be negotiated with investment banks. It is recommended that the main body of the plan does not affect the operation of the school.
  o The listing valuation is based on the average of the benchmark industry, and the valuation model is mainly calculated by the discounted cash flow method and the conventional market valuation method.
· Anti-dilution Provision
  o The school's board of directors and the original shareholders agreed on the capital increase and share expansion plan before listing in order to prepare for the issues of capital reserves.
  o All shareholders and their holdings will be subject to anti-dilution provision.

**Patten University Due Diligence Report – Historical and Future Financials**

42.    On information and belief, these and other representations in the Patten University Due Diligence Report were false and/or misleading and were intended by QZ to induce Chan and Zhang to invest in the Patten-Stanford United College Scheme.  On information and belief, at the time, Patten University had fewer than 200 registered students, less than 10% of the representation in the Patten University Due Diligence Report.

43.    In order to further induce Plaintiffs to invest, QZ also began sending mock-ups of "signage" for the Patten-Stanford United College that he said Patten and Stanford were already collaborating on.  On or about June 25, 2021, QZ sent Chan via WeChat designs for the Patten-Stanford United College logo:

COMPLAINT

**Patten-Stanford United College Signage – QZ WeChat Messages**

44.    The next day, on or about June 26, 2021, QZ sent purported designs for the signage as it would appear on the Patten Stanford United College campus, which he described as "Cool":



**Patten-Stanford United College Signage - QZ WeChat Messages**

**Patten-Stanford United College Signage**

45.      On information and belief, Stanford had no knowledge of these proposed designs and had not collaborated with QZ or anyone else from Patten University in their creation.

**QZ Encourages Chan and Zhang to Set Up U.S. Companies (WEAI and Bluestone) and Corporate Bank Accounts at Chase**

46.      At the same time that QZ was sending fraudulent due diligence reports and financial statements to Chan and Zhang in early 2021, he was also pressuring them to invest as quickly as possible so as not to miss out on Patten University's impending IPO (which he represented would happen in the next several months).  QZ also told Chan and Zhang that the investment required approval from Patten University's board, and that that approval process would be significantly delayed – and potentially rejected outright – if the direct investors were Chinese nationals.  In contrast, if the investors were companies incorporated and based in the United States, the approval process would be much smoother.  Accordingly, QZ suggested that Chan and Zhang set up U.S.-based companies to act as the nominal investors.  On information and belief, QZ made this suggestion to facilitate his misappropriation of Chan and Zhang's funds.

47.      Chan and Zhang were open to this approach if it would expedite the approval process, but they explained to QZ that they had no experience incorporating U.S. entities and were in any event unable to travel to the United States at that time (or for the foreseeable future) due to the severe COVID-19-related travel restrictions imposed by the Chinese government.  QZ told them not to worry: he had experience incorporating U.S. entities and could arrange the paperwork for them.  Though Chan and Zhang initially wanted to do the incorporation process through a contact they had who had some limited experience incorporating U.S. entities, QZ dissuaded them from doing so by telling that it would be faster to work through the process with trustworthy professionals – with corporate registration, taxation, and corporate law expertise – he identified.

48.     The names selected for the two corporate investment vehicles were Bluestone Investment Inc. (for Zhang's investment) and World Education Association, Inc. (for Chan's investment).  Bluestone Investment Inc. (Plaintiff Bluestone) was incorporated in Delaware on or around February 25, 2021.  World Education Association, Inc. (Plaintiff WEAI) was incorporated in Delaware on or around April 16, 2021.  QZ arranged for the preparation and submission of the corporate formation paperwork (among other things, designating initial corporate officers and directors, including Chan for WEAI and Zhang for Bluestone), and used a shared office space in Hayward, California (located at 31259 Wiegman Road) as the U.S. business address for both entities.[3]  The documentation registered with the Delaware Secretary of State's office reflects that Plaintiffs Chan and Zhang are the principals of these entities:

---

[3]  The U.S. business addresses for both Bluestone and WEAI was changed in 2024 to 1325 Howard Ave., #210, Burlingame, CA 94010.

**State of Delaware**

**Annual Franchise Tax Report**

| | |
|---|---|
| CORPORATION NAME<br>BLUESTONE INVESTMENT INC | TAX YR<br>2021 |
| FILE NUMBER: 5253878  INCORPORATION DATE: 2021/02/25  RENEWAL/REVOCATION DATE: | |
| PRINCIPAL PLACE OF BUSINESS<br>8 THE GREEN STE A<br>DOVER, DE 19901 | PHONE NUMBER<br>(650)680-5018 |
| REGISTERED AGENT<br>A REGISTERED AGENT, INC.<br>8 THE GREEN, STE A<br>DOVER DE 19901 | AGENT NUMBER<br>9768720 |

| AUTHORIZED STOCK | | DESIGNATION/ | | |
|---|---|---|---|---|
| BEGIN DATE<br>2021/02/25 | END DATE | STOCK CLASS<br>COMMON | NO. OF SHARES<br>1,000 | PAR VALUE/ SHARE<br>.0010000000 |

| OFFICER | NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|---|
| LISHAN ZHANG | | 31259 WIEGMAN RD<br>HAYWARD, CA 94544 | PRESIDENT |

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP |
|---|---|---|
| LISHAN ZHANG | | 31259 WIEGMAN RD<br>HAYWARD, CA 94544 |

NOTICE: Pursuant to 8 Del. C. 502(b). If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.
AUTHORIZED BY OFFICER, DIRECTOR OR INCORPORATOR    DATE    TITLE
LISHAN ZHANG                                    2022/01/10    PRESIDENT
31259 WIEGMAN RD
HAYWARD, CA 94544 US

**Bluestone Investment Inc. – 2021 DE Franchise Tax Report**

49.    As corporate officers and directors in addition to Zhang and Chan, QZ proposed individuals, whom Chan and Zhang understood to be trustworthy professionals with deep experience in corporate registration, taxation, and corporate law issues, named "Jacklyn Kelly" and "Guizhong Tan" for these roles at Bluestone and WEAI, respectively.

On information and belief, and unknown to Chan and Zhang at the time, Jacklyn Kelly and Guizhong Tan are fictitious names invented by QZ and do not exist. Significantly, QZ did not propose that he himself (QZ), or any family member of his, be designated as corporate officers or directors at either Bluestone or WEAI. Chan and Zhang would not have agreed to make either QZ – or any family member of QZ – corporate officers or directors at either Bluestone or WEAI (or to give either QZ or any family member of QZ signing authority for any Bluestone or WEAI corporate bank account). Moreover, had they known these individuals were not trustworthy professionals as described by QZ, they would have opted to locate their own U.S.-based proxies to designate as corporate officers or directors with signing authority at Bluestone and WEAI's corporate bank accounts.

50.    Consistent with QZ's proposal, the Incorporator Initial Resolutions for Bluestone appointed "Jacklyn Kelly" as Secretary and a Director of the corporation, and Plaintiff Zhang as President, Treasurer, and the other Director:

**INCORPORATOR INITIAL RESOLUTIONS**

I, Patrick Brickhouse          , of  A Registered Agent, Inc.          , being the Incorporator of

Bluestone Investment Inc , a  Delaware       corporation, hereby resolve to

relinquish signing authority to the newly appointed officers and directors and

adopt the following resolutions:

1.    **Resolved**, that the following named officer(s) and director(s) of the
      corporation are hereby appointed and directed to serve until the first
      annual meeting of stockholders, and/or until their successors are elected
      and appointed, or they are re-elected at their annual meeting.

      President:    Lishan Zhang

      Treasurer:    Lishan Zhang

      Secretary:    Jacklyn Kelly

      Director:     Lishan Zhang and Jacklyn Kelly

2.    **Resolved**, that Bluestone Investment Inc was incorporated in Delaware
      on 02 25 2021 with assigned filing number 5253878 .

3.    **Resolved**, that the copy of the Articles of Incorporation of the above
      named corporation is complete, and be inserted into the official corporate
      record book.

4.    **Resolved**, that the bylaws be adopted as the bylaws for the corporation,
      and be inserted into the minute book of the corporation record book.

5.    **Resolved**, that if the stockholders fail to hold their initial and/or annual
      meetings, that the above named directors will remain in their appointment
      until the stockholders hold their meeting, and that the corporation will stay
      active pursuant to state statute.

Pat Brine                              02/25/2021

**Bluestone – Incorporator Initial Resolutions**

51.    Similarly, consistent with QZ's proposal, the Incorporator Initial Resolutions

for WEAI appointed "Guizhong Tan" as President, Secretary, and Director of the

corporation, and Plaintiff Chan (referred to by her Chinese name Yuting Chen) as

Treasurer:

**INCORPORATOR INITIAL RESOLUTIONS**

I, Patrick Brickhouse    , of A Registered Agent, Inc.    , being the Incorporator of
World Education Association Inc , a Delaware    corporation, hereby resolve to
relinquish signing authority to the newly appointed officers and directors and
adopt the following resolutions:

1.    **Resolved**, that the following named officer(s) and director(s) of the
corporation are hereby appointed and directed to serve until the first
annual meeting of stockholders, and/or until their successors are elected
and appointed, or they are re-elected at their annual meeting.

President:    Guizhong Tan

Treasurer:    Yuting Chen

Secretary:    Guizhong Tan

Director:    Guizhong Tan

2.    **Resolved**, that World Education Association Inc was incorporated in Delaware
on 04 16 2021 with assigned filing number 5847567 .

3.    **Resolved**, that the copy of the Articles of Incorporation of the above
named corporation is complete, and be inserted into the official corporate
record book.

4.    **Resolved**, that the bylaws be adopted as the bylaws for the corporation,
and be inserted into the minute book of the corporation record book.

5.    **Resolved**, that if the stockholders fail to hold their initial and/or annual
meetings, that the above named directors will remain in their appointment
until the stockholders hold their meeting, and that the corporation will stay
active pursuant to state statute.

Brickhouse    04/19/2021

**WEAI – Incorporator Initial Resolutions**

52.    QZ was not appointed as an officer or director at either Bluestone or WEAI,
nor was any family member of QZ appointed to any such position.  Moreover, under
corporate bylaws and Delaware law, Bluestone and WEAI could only appoint or remove
officers by board action, which requires either a majority vote at a board meeting or
unanimous written consent signed by all directors.  Similarly, Bluestone and WEAI could
only appoint or remove directors by majority shareholder action.  No action by the original

board of directors appointing new or different officers ever occurred (nor could it have

because, on information and belief, Jacklyn Kelly and Guizhong Tan are not real people).

Nor did Chan or Zhang (as majority shareholders of WEAI and Bluestone, respectively),

replace Kelly and Tan as directors until January 2024.[4]

53.     QZ was now ready to unveil the next stage of his scheme: he told Chan and

Zhang that the U.S. investment vehicles (Bluestone and WEAI) would need corporate bank

accounts in the United States.  Otherwise, he warned, the approval process by Patten

University's board could be significantly delayed (or rejected outright) because the

investment funds would be coming not from the corporate investors but from individual

accounts owned by Chinese nationals.  Accordingly, QZ suggested that Chan and Zhang

set up corporate bank accounts for Bluestone and WEAI.  On information and belief, QZ

made this suggestion to facilitate his misappropriation of Chan and Zhang's funds.

54.     As with the creation of the corporate investment vehicles, Chan and Zhang

were open to this approach if it would expedite the approval process, but they again

explained that they were unable to travel to the United States due to COVID-19 restrictions

and therefore would not be able to apply in person at any bank, should that be required.

After consulting a friend, they learned that they could open a U.S. bank account at East

West Bank ("EWB"), which allowed remote account opening.  Though QZ disparaged

EWB and strongly opposed Chan and Zhang's use of EWB for this investment, they

initially opted to proceed with EWB.

55.     Zhang initially opened a corporate bank account for Bluestone remotely with

East West Bank ("EWB"), in or around March 2021.  In or around May and June 2021,

Zhang transferred $29.5 million into the Bluestone corporate account at EWB.  This

---

[4]  Through written consent of their shareholders (Plaintiff Zhang and Plaintiff Chan, respectively), Bluestone and WEAI confirmed and clarified the composition of their Boards of Directors in January 2024, to remove Jacklyn Kelly, Guizhong Tan, and "any other person claiming or purporting to be a director of the Corporation[.]"  Bluestone and WEAI's bylaws were also amended and restated at that time.

significant influx of funds into the Bluestone EWB account from China prompted EWB to inquire with Zhang (Bluestone's principal and account signer), in or around June 2021, about the company's source of funds and the nature of its business. Plaintiffs informed QZ of these inquiries, given QZ's involvement in facilitating approval of their investment. Though Plaintiffs initially responded that Bluestone's business was an investment in Patten University, EWB also requested investment-related documents, such as a pitch deck and investment agreements.

56. On information and belief, QZ realized that EWB's inquiries into Bluestone, its source of funds, and its business threatened to derail his misappropriation of Chan and Zhang's funds. QZ proceeded to ramp up his disparagement of EWB to Chan and Zhang and also told them that EWB's inquiries suggested that EWB would report or freeze the account, derailing the contemplated investment in Patten University. He requested that Chan and Zhang stop responding to EWB's inquiries and offered to take over communications with EWB to avoid that disastrous outcome. On information and belief, he did so to further his fraudulent scheme by providing false or misleading answers to EWB's inquiries.

57. When that didn't work, QZ's next move was to tell Chan and Zhang that Patten University would require the U.S. investment vehicles (Bluestone and WEAI) to have corporate bank accounts not with what he described as a small bank like EWB, but with the bank he described as the largest and most reliable U.S. bank: Chase. He also told Chan and Zhang that EWB's inquiries threatened to slow down the investment process and jeopardize the deal, whereas Chase would allow them to streamline the process. But Chase – unlike EWB – had a policy requiring the in-person attendance of authorized corporate officers in order to open a corporate bank account. Once again, QZ told Chan and Zhang not to worry: Bluestone and WEAI's previously designated U.S.-based corporate officers (who, on information and belief, were not real people) could take care of the administrative

tasks associated with opening the corporate bank accounts, including the requirement to appear at the bank in person.

58.     On information and belief, QZ pushed Plaintiffs to open the corporate bank accounts at Chase because he was personal friends with one of the bankers there (Defendant Andrew Babes) and knew that Babes would use his position at Chase to facilitate QZ and his accomplices' exploitation of Plaintiffs' funds and accounts.

59.     On information and belief, QZ was right.  Specifically, on information and belief, QZ and his mother, Defendant Jingling Li, undertook to open corporate bank accounts at Chase for WEAI and Bluestone in or around July 2021.  On information and belief, QZ and Li were only able to open Chase bank accounts in lieu of any properly authorized corporate representative – notwithstanding Chase policies requiring in-person verification of authorized corporate officers, including submission of identification documents, business documentation, and supplemental documentation identifying the corporation's current authorizing representatives – because of QZ's personal relationship with Babes, which resulted in Chase either not requesting documentation required by Chase's policies for corporate account opening or turning a blind eye to QZ and Li's lack of actual authority to act on WEAI and Bluestone's behalf, which would have been evidenced by that documentation.  At that time, Plaintiffs knew neither that Li was QZ's mother nor that QZ and his mother took charge of opening the Chase bank accounts (which gave them subsequent access to and control over those accounts).  Had they known, Plaintiffs would not have authorized QZ or his family members to have signatory authority over WEAI or Bluestone corporate accounts.

**QZ and Accomplices (Defendants Sawyer and Ethan) Induce Plaintiffs to Enter Into the Patten-Stanford United College Stock Agreements**

60.     Although, on information and belief, QZ was the mastermind of the Patten-Stanford United College Scheme, he was assisted by a number of accomplices.  Some of these accomplices are unknown at this time (referred to as Does 1-25), but two known

accomplices (beyond Li, Babes, and Chase) are Defendants William Sawyer and Scott Ethan.

61.    Defendant Sawyer participated in multiple Zoom meetings related to the Patten-Stanford United College Scheme.  (None of Plaintiffs' meetings with QZ or the other accomplices about the Patten-Stanford United College Scheme were in person because COVID-19 restrictions in place in early 2021 prevented Plaintiffs from traveling to the United States).  Several of these Zoom meetings were attended by QZ and other representatives from Patten University (including Nathan Breitling, Patten University's Chief Academic Officer, and David Haubert, Alameda County Supervisor and former Mayor of Dublin):



**Patten-Stanford United College Scheme Zoom Call – Left/Center: David Haubert; Right in Descending Order: Defendant QZ; Plaintiff Chan; Defendant Sawyer; Ralph DeFranco; David Haubert**

62.    Further, at least one of these Zoom meetings was a one-on-one meeting between Defendant Sawyer and Plaintiff Chan.  At that meeting, Sawyer discussed

financial details of Plaintiffs' proposed investments into the Patten-Stanford United College Scheme.

63.     Defendant Ethan also attended Zoom calls with Plaintiffs regarding the Patten-Stanford United College Scheme, and he attended various in-person events put on by Patten University in China, including an MBA graduation ceremony in or around April 2021.  He further communicated with Plaintiffs (and their China-based representatives) over email regarding the proposed investments.

64.     Defendant Ethan is also the conspirator that sent the Patten-Stanford United College Stock Agreements to Plaintiffs Chan and Zhang for signature via DocuSign. Specifically, on or about July 4, 2021, Ethan sent to Zhang, via DocuSign, the Bluestone "Stock Purchase Agreement" and "IPO Promissory Note" (collectively, the "**Bluestone Patten-Stanford United College Stock Agreements**"), and, on or about July 10, 2021, sent Plaintiff Chan the WEAI "Stock Purchase Agreement" and "IPO Promissory Note" (collectively, the "**WEAI Patten-Stanford United College Stock Agreements**") (together with the Bluestone Patten-Stanford United College Stock Agreements, the "**Patten-Stanford United College Stock Agreements**").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



From:        "Scott Ethan via DocuSign" <dse_NA4@docusign.net>
Sent:        Sun 7/4/2021 2:08:42 AM (UTC)
To:          "Lishan Zhang" <13501183679@163.com>
Subject:     Please DocuSign: Patten SPA 866S WEX1.pdf, CONVERTIBLE PROMISSORY
             NOTE SEC INC896.pdf

Scott Ethan sent you a document to review and sign.

**REVIEW DOCUMENTS**

**Scott Ethan**
scotte@sv.patten.edu

Bluestone Investment Inc and Patten Holding LLC / Patten University Transactions
Documents are attached.

16    **Defendant Ethan – DocuSign Email to Plaintiff Zhang**

17    65.    Further, it was Defendants Sawyer and Ethan – not QZ – who signed the

18    Patten-Stanford United College Stock Agreements on behalf of Patten University and

19    Patten Holding.  Specifically, Sawyer signed all four of the Patten-Stanford United College

20    Stock Agreements on behalf of Patten Holding (as well as, for the Bluestone IPO

21    Promissory Note, on behalf of Patten University), and Ethan signed the Bluestone Stock

22    Purchase Agreement and WEAI IPO Promissory Note on behalf of Patten University.  On

23    information and belief, QZ enlisted Sawyer and Ethan to sign the agreements in order to

24    conceal his own role in the Patten-Stanford United College Scheme, even though he was at

25    all times the mastermind behind the fraud and an alter ego of Patten Holding.

26
27
28



**Bluestone Stock Purchase Agreement – Signature Page**

66.     The Patten-Stanford United College Stock Agreements contain several representations and warranties by Patten Holding and Patten University that, on information and belief, are false and/or misleading and were intended by Defendants to induce Chan and Zhang to invest in the Patten-Stanford United College Scheme.  Most notably, Patten University represented that it **"guarantees the validity and sustainability of the authorization of Patten Stanford United College."**

(iv)     Patten University guarantees the validity and sustainability of the authorization of Patten Stanford United College. At the same time, the authorize party shall to ensure compliance with the laws of the United States and China and the rules and regulations of Patten Stanford United College.

**Bluestone Stock Purchase Agreement – Section 1.2(b)(iv)**

67.     On information and belief, other misrepresentations by Defendants in the Patten-Stanford United College Stock Agreements include, *inter alia*, the representation in Section 2.10(a) of the Bluestone Stock Purchase Agreement that "Patten Holding has heretofore provided to Company [Bluestone] true, complete and correct copies of audited balance sheets, statements of operations, and cash flows for Patten Holding (together with all notes and opinions thereto of independent auditors) for the fiscal years ended 12/31/2013 through 12/31/2020 (the 'Financial Statements'). The Financial Statements have been prepared on the accrual basis and otherwise in conformity with GAAP and

GAGAS and present fairly in all material respects the Membership Units, liabilities, financial position and results of operations of Patten Holding"; the representation in Section 2.8(a) of the Bluestone Stock Purchase Agreement that "No representation or warranty of Patten Holding in this Agreement and no statement in the Disclosure Letter omits to state a material fact necessary to make the statements herein or therein, in light of the circumstances in which they were made, not misleading"; and the representation in Section 2(b) of the WEAI Stock Purchase Agreement that "Patten Holding has the capacity to execute, deliver and perform his obligations under this Agreement."[5]

68.     Notwithstanding their reliance on QZ and the other Defendants' representations described above in entering into the Patten-Stanford United College Stock Agreements, Plaintiffs knew that the Patten Holding stock they would be acquiring would not be worth the enormous agreed-upon purchase price (**$27.3 million** for Bluestone and **$13.65 million** for WEAI to acquire 30% and 15% of the company, respectively) unless QZ delivered on his promise of the Patten-Stanford United College.[6]  Accordingly, the Patten-Stanford United College Stock Agreements provide for the vast majority of the investment funds to be placed in an escrow account, with their release conditioned upon Patten Holding's delivery of a signed authorization agreement from Stanford University. This was referred to as the "**Milestone Event**" (the only one included in the contracts), and if it did not occur within 45 days, all of the escrow funds would be immediately returned to Plaintiffs (and the entirety of the agreements voided):

---

[5]   Patten Holding represented in both Stock Purchase Agreements that it was the sole owner and co-operator of Patten University.

[6]   Ultimately, WEAI was unable to raise the full $13.65 million for the initially contemplated 15% stake, and the parties thus agreed that WEAI would instead invest $8.19 million for a 9% stake.

(iii)     For the purpose hereof, the "Milestone Event" means Patten University's entering into a cooperation or similar agreement(s) with Stanford University, in a form satisfactory to the Company (the "Stanford Agreement"), pursuant to which Stanford University shall have expressly agreed to authorize Patten University or its affiliates to form a collaborative school and two laboratories in collaboration with Stanford University in the People's Republic of China. Please refer exhibit 3A and Actions By Written Consent 3A-1 for authorized party(entity) and structure.

(iv)     Patten University guarantees the validity and sustainability of the authorization of Patten Stanford United College. At the same time, the authorize party shall to ensure compliance with the laws of the United States and China and the rules and regulations of Patten Stanford United College.

(v)     Notwithstanding anything to the contrary, in the event that the Milestone Event does not occur within 45 days of the date of this Agreement, at Company's sole discretion and by providing a written notice to Patten Parent, any and all amounts in the Escrow Account shall be returned to Company in full, and this Agreement shall be null and void *ab initio*.

### Bluestone Stock Purchase Agreement – Section 1.2(b)(iii) and (v)

69.     The WEAI Stock Purchase Agreement similarly required the establishment of an escrow account and a condition that, at closing, Patten Holding deliver a "Patten Stanford United College authorization" and that, "[i]n case the Patten Stanford Node and two labs authorizations are not confirmed, Patten shall provide a full refund to the Company." (Section 1(a)(B)).

70.     The Bluestone Stock Purchase Agreement also provided that, in the event Patten Holding did not (as QZ promised) "consummate its initial public offering within one (1) year of the Escrow Release," Bluestone would be entitled to a stock redemption of no less than "200% of the per unit purchase price under this Agreement." (Section 10.3(a)).

71.     Further, both IPO Promissory Notes provided that the entire investment amounts would be returned to Plaintiffs, with 9% interest, if Patten Holding and/or Patten University did not IPO within one year of the closing date.

72.     As explained further below, Patten Holding and Patten University breached these (and other) provisions of the Patten-Stanford United College Stock Agreements by failing to, *inter alia*, (a) deliver a valid Stanford Agreement; (b) redeem Bluestone's stock at 200% of the $27.3M purchase price despite the lack of an IPO event within one year; or (c) return Plaintiffs' investment funds plus 9% interest, despite repeated written requests.

**QZ and Jingling Li Misappropriate Plaintiffs' Funds with the Assistance of Babes and Chase**

73.    Around the time the Patten-Stanford United College Stock Agreements were being executed, and in preparation for the investment contemplated therein, Plaintiffs began transferring funds into the corporate Chase accounts they (wrongly) believed were accounts under the control of WEAI and Bluestone's duly authorized agents but were, on information and belief, under the control of *unauthorized* corporate agents – QZ and his mother – who had been placed in control of WEAI and Bluestone's corporate Chase accounts because Babes and Chase failed to follow Chase's own policies or turned a blind eye to verifying purported corporate representatives' authority during the account opening process.  Though Plaintiffs would not come to realize it until years later (as explained further below), in so doing, Plaintiffs lost the funds they had planned to invest in Patten University.

74.    Specifically, on or around July 6, 2021, Chan transferred $8.191 million into the corporate WEAI Chase account.  The following week, on or around July 13, 2021, Chase Vice President Ronald Gunawan received via email a copy of the WEAI Patten-Stanford United College Stock Agreements "for [his] record[s]," outlining the contemplated escrow process for the planned investment in Patten University.

75.    Similarly, on or around July 13, 2021, Bluestone transferred $29.546 million into the corporate Bluestone Chase account.  Zhang effected this transfer by instructing EWB to transfer the funds from the Bluestone EWB account to the Bluestone Chase account, describing the transfer as a "Same Corporation Transfer."

76.    On information and belief, given all the questions EWB had been asking about the source of Bluestone's funds and its planned investment in Patten University, EWB would not have approved the July 13, 2021 funds transfer had it been a transfer to a third party rather than an intra-company transfer.  Accordingly, on information and belief, absent Babes and Chase's opening of the corporate Bluestone account in contravention of

Chase's own policies and without exercising due care to verify that the purported corporate representatives were duly authorized by Bluestone to open (and then access and control) a Chase bank account, QZ and his accomplices would not have been able to misappropriate Bluestone's funds.

77.    On information and belief, around this same time, Defendant Jingling Li sought to pressure EWB, via email, to approve the funds transfer from the Bluestone EWB account to the Bluestone Chase account.  In response, EWB sent an email to Li copying, among others, Chase employees Babes and Gunawan, expressing concern about Li's – a non-signer in the Bluestone EWB account – involvement and explaining that EWB would communicate with Zhang about the Bluestone account, not with Li.



**EWB Email to Li, Babes (Chase), and Ronald Gunawan (Chase)**

78.    This was yet another sign to Chase that something was amiss with the Bluestone corporate accounts (and with the transactions to and from that account).  Indeed, shortly after completing the Bluestone intra-company funds transfer, on July 18, 2021,

EWB notified Bluestone in writing that it "made the decision to exercise its right to close your account," and it subsequently closed Bluestone's account. But, on information and belief, Chase instead decided to turn a blind eye. At no time did Chase even attempt to follow EWB's lead and "communicate with Mr. Zhang directly" (or with Chan directly) regarding the transactions involving their Bluestone (or WEAI) corporate account.

79.    Thereafter, on information and belief, on or around July 19, 2021, Defendant Babes confirmed that $27.3 million had been transferred from the corporate Bluestone Chase account to a "Patten Project Bluestone WEA Holdings" account. QZ told Plaintiffs that this account was an escrow account consistent with the escrow process outlined in the Bluestone Stock Purchase Agreement. On information and belief, this statement was false – that account was also an account under the control of QZ (a fact that was well-known to Babes and Chase). However, Plaintiffs believed QZ and (wrongly) understood this transfer to correspond to a transfer of funds from Bluestone into the escrow account.

### QZ Delivers Forged Stanford Agreements

80.    On information and belief, QZ knew that Stanford University would never authorize a "Patten-Stanford United College" and never even attempted to obtain Stanford's consent to any such cooperation agreement. Instead, QZ proceeded immediately to the next phase of his scheme: forging the signatures of senior Stanford University administrators.

81.    On or about August 25, 2021, QZ sent Chan via WeChat a "General Framework of Cooperation" ("PUGFCpe.pdf"), purporting to be between Stanford University and Patten Holding (the **"Stanford Cooperation Agreement"**).



**Stanford Cooperation Agreement – QZ WeChat Message**

82.    The Stanford Cooperation Agreement outlines several "[a]reas of collaboration" between Stanford and Patten University in order to establish "Patten Stanford United College, AI and FinTech Research Center in Greater China Area."  The Stanford Cooperation Agreement bears a "**Stanford | Office of the President**" header and is purportedly signed by **Stanford's then-President, Marc Tessier-Lavigne**.  On information and belief, this document was a forgery that was not signed by Tessier-Lavigne.



**Stanford Cooperation Agreement – Stanford Logo**



**Stanford Cooperation Agreement – Signature Block (on left, Marc Tessier-Lavigne, President of Stanford University)**

83.    Also on or about August 25, 2021, QZ sent Chan via WeChat a "Custom Professional Education Agreement" ("PUSRC.pdf") purporting to be between Stanford University's Center for Professional Development ("SCPD") and Patten Holding / Patten University (the **"Stanford Long-Form Agreement"**) (together with the Stanford Cooperation Agreement, the **"Stanford Agreements"**).

2021年8月25日 9:02

PUSRC.pdf
1.2M

PDF

**Stanford Long-Form Agreement – QZ WeChat Message**

84.    The Stanford Long-Form Agreement is a 17-page document purporting to "describe[] the responsibilities and terms by which the parties plan to engage in a custom professional education offering" to be known as "**Patten Stanford United College or Patten Stanford Node in Shenzhen**."  The Stanford Long-Form Agreement has detailed provisions governing, *inter alia*, Program Responsibilities, Program Management, Payment and Taxes, Intellectual Property, the "Reputation of Stanford," "Stanford Faculty Director(s)," Traveler Insurance and Permissions, Use of Name and Logo, Audit Rights, Independent Contractors and Insurance, Indemnification, Trade Sanctions Compliance, Anti-Corruption Provisions, Confidentiality, and Dispute Resolution.  The Stanford Long-Form Agreement has Stanford logos on every page and is purportedly signed by a representative from SCPD (on information and belief, intended to be Carissa Little's signature).  On information and belief, this document was a forgery that was not signed by anyone from Stanford.

**Stanford University
&
Patten Holding LLC /
Patten University**

**08/2021**

### Project Menu

| | |
|---|---|
| Professional Education Agreement | 1-11 |
| Program Dates | 12 |
| Marketing Guidelines | 13-14 |
| AI and FinTech Lab Affiliation | 15 |
| Research Policy Handbook | 16 |

**Stanford Long-Form Agreement – Cover Page**

**Stanford** | Center for
Professional Development

**Stanford Long-Form Agreement – Stanford Logo**

In witness where of, the Parties hereto have executed this Agreement as of the Effective Date.

Stanford Center for Professional
Development Stanford University

Patten Holding LLC
Patten University

**Stanford Long-Form Agreement – Signature Block**

85.    William Sawyer signed the Stanford Long-Form Agreement on behalf of Patten Holding and Patten University.

**Patten Fails to IPO, the Patten-Stanford United College Fails to Launch, and**
**Plaintiffs Incur Significant Monetary and Reputational Harm**

86.    Despite QZ's repeated promises – and Patten Holding's reported "closing" of the escrow process after the delivery of the Stanford Agreements – the Patten Holding / Patten University IPO did not materialize by the one-year mark.  Nor, by mid-to-late 2022,

had there been any launch of the Patten-Stanford United College.  Nevertheless, in breach of the Patten-Stanford United College Stock Agreements, Patten Holding refused to (*inter alia*) redeem Bluestone's $27.3 million investment at the promised 200% redemption rate or refund Plaintiffs' investments with the promised 9% return.  Instead, QZ doubled down on his fraudulent concealment of the Patten-Stanford United College Scheme and offered excuses for the delays, all the while assuring Plaintiffs that the value of their investment continued to increase.

87.    The injuries caused by QZ's and his accomplices' fraud and breaches were not limited, however, to the misappropriated investment funds.  In reliance on QZ's misrepresentations, Plaintiffs incurred additional, significant monetary and reputational harm.

88.    For example, in reliance on the promise that she would be the exclusive representative for Patten-Stanford United College and Patten University in the greater China region, Chan set up a company called Patford Education (Shenzhen) Co. Ltd. ("**Patford**"), whose name was a portmanteau of Patten and Stanford.  Given the representations made by QZ regarding the world-class reputation of both Patten University and Stanford, and the need for Patford to have state-of-the-art facilities that could accommodate (among other things) students enrolled in Patten University online degree programs from Shenzhen, and China more broadly, for in-person classes, lectures, or events, Chan invested significantly in Patford's offices and employees.  This included elaborate displays showing the history and leadership of Patten University.





**Patford Offices – Architectural Plans (Lobby Wall 2)**



**Patford Offices – Photograph of Lobby**

89.    All of these pictures and information came from QZ, including the "Faculty & Adjunct" photos that feature Defendants Ethan and Sawyer (identified as Vice President and Vice Dean, respectively).



**Patford Offices – Patten University Faculty and Adjuncts (Scott Ethan and William Sawyer, far right)**

90.     Chan's financial investment in Patford was ultimately a total loss, as the Patten-Stanford United College never launched and many of the students that Patford recruited for Patten University never received any instruction or degrees (despite paying approximately $50,000 per student in tuition directly to Patten Holding).  Further, when these students realized they had been defrauded of their tuition money and were unable to obtain refunds (or even responses) from QZ or Patten University, they came to Patford and Chan for assistance – resulting in significant reputational harm as well.

91.     QZ and his accomplices' misappropriation of Plaintiffs' funds was also not limited to the Bluestone and WEAI investments.  QZ offered to help Chan set up additional U.S. companies with corporate accounts at Chase for additional investments in the Patten-Stanford United College Scheme and other purposes, which, on information and belief, Chase negligently allowed QZ to open, access, and control without proper corporate authorization.  Those corporate entities are Stanford Portfolio Xtimes, GGI Holdings (Golden Grand Investment), and Silicon Valley Tech Capital LLC.  On information and

belief, the corporate arrangement was ostensibly the same as with WEAI – the U.S. corporate representative was supposed to be Guizhong Tan (who, again, appears not to be a real person), not QZ or any QZ family member.  QZ has misappropriated and refused to return funds Chan personally invested in these companies and accounts.

92.    As another example, on information and belief, in September 2023 Defendant Jingling Li improperly accessed and withdrew $150,000 from the Bluestone Chase bank account (funds that were not earmarked for the Patten-Stanford United College investment and that belonged to Zhang and Bluestone).



**Chase Withdrawal Slip – Jingling Li $150,000 Withdrawal**

**Plaintiff Chan Travels to the United States Post-COVID and Plaintiffs Finally Uncover QZ and His Accomplices' Fraud**

93.    By early 2023, based on the continuing absence of any Patten University IPO or Patten Stanford Node, Plaintiffs began asking QZ to redeem the shares or return the investment funds (plus interest) pursuant to the Patten-Stanford United College Stock Agreements.  QZ, however, continued to fraudulently conceal the truth by assuring them that the delays were only temporary and that the value of their stock was still increasing.

QZ also promised Zhang that he was eligible to enroll, tuition-free, in Patten University's MBA program.

94.    In late June 2023, however, Plaintiffs lost their patience and demanded that QZ honor the Patten-Stanford United College Stock Agreements by redeeming Bluestone's shares at the 200% redemption rate and refunding WEAI's investment funds with the promised 9% interest.  In response, QZ went radio silent and stopped responding to any of Plaintiffs' communications.  Left with no other options, and fortunately with China's COVID-19 travel restrictions finally lifted, Chan booked flights to the United States to investigate and secure the return of Plaintiffs' funds.

95.    Chan arrived in California on or around June 27, 2023.  For several days, she attempted to contact QZ without success.  Chan was, at this point, extremely concerned about the fate of the investment funds, which totaled more than $35 million.  On information and belief, QZ was intentionally avoiding her in order to continue his fraudulent concealment of the Patten-Stanford United College Scheme.  Finally, on or around July 7, 2023, QZ agreed to meet Chan at a Starbucks in Redwood City, California.

96.    At the Starbucks meeting, Chan once again demanded that QZ comply with obligations of the Patten-Stanford United College Stock Agreements by redeeming the Bluestone stock and refunding WEAI's investment funds with interest.  QZ initially attempted to deflect the conversation, but he eventually agreed and assured Chan that he would fully honor the commitments through redemption and refunds.  He then again tried to change the subject.  However, Chan insisted that they discuss details of when and how the funds would be returned.  At this point, QZ became agitated and came up with a pretext to try to leave.  Chan attempted to stop him, and in response QZ physically struck Chan and then fled the Starbucks at a full run (to the astonishment of multiple witnesses, one of whom called the police to report QZ's assault).

97.    Following his sprint out of the Starbucks, QZ again went radio silent.  Chan realized she needed to further investigate the circumstances surrounding the Patten-

Stanford United College Scheme. Her first step was visiting Patten University (which she and Zhang had not previously done due to the COVID-19 pandemic).

98.    Chan hailed an Uber to get to Oakland, and was stunned to learn that the driver had never heard of Patten University, even though he had lived in the San Francisco Bay Area for decades. Based on QZ and his accomplices' representations, Chan had understood Patten University to be well-known in America (even if, in China, it was unknown).

99.    Chan's next shock came when she tried to walk around the Patten University "campus" at 2433 Coolidge Ave. The building appeared to be barricaded, and there was no evidence of any students or that a university operated at the location. She encountered a security guard who told her that Patten University was not actually operating or offering any classes at that time. All of this came as an enormous shock to Chan, who – like Zhang – had never suspected that QZ and his accomplices' representations about Patten University were false.

100.    Chan next attempted to get in touch with Defendant Babes at Chase, whose name, contact information, and signature had appeared on several banking documents related to the Patten-Stanford United College Scheme. On or about July 11, 2023, she was able to connect over email with Babes, and he agreed to meet her at the Chase branch at 3603 Mt. Diablo Blvd. in Lafayette the following day.

101.    On or about July 12, 2023, Chan met with Defendant Babes at the Chase branch in Lafayette. Chan brought with her print outs of documents identifying her and Zhang as officers, directors, and shareholders of WEAI and Bluestone, as well as Chase documents and receipts signed by Babes relating to the corporate accounts and the investment escrow process.

102.    Defendant Babes said he already knew about Chan and Zhang and their involvement in WEAI and Bluestone (as well as Chan's involvement with Stanford Portfolio Xtimes, GGI, and Silicon Valley Tech Capital). However, he refused to provide

her with any information about the funds in those accounts, because neither she nor Zhang were, according to Chase, authorized signers on the accounts.  Instead, the authorized signers, according to Chase, were **Jingling Li** (for Bluestone) and **QZ** (for WEAI, Stanford Portfolio Xtimes, GGI, and Silicon Valley Tech Capital).  Alarmed, Chan said that she and Zhang wanted to change the signers to the duly authorized corporate representatives: herself and Zhang.  Babes told her she would need QZ and Li to do that. He suggested that she first speak with QZ and obtain his consent, and then schedule another appointment, during which QZ or Li would need to accompany Chan to the bank to change the authorized signers on the accounts.  He also mentioned that Li had been in the office to see him a week or two ago, in connection with the Bluestone Chase corporate account.

103.    Chan was astonished at what Babes had told her.  She again showed him documentation confirming that she and Zhang were the lawful principals of WEAI and Bluestone.  She also showed him the corporate account-related documents and receipts bearing his signature.  In response, **Defendant Babes laughed and said he had never seen the documents before and that none of the documents had been signed by him**. Even though Babes was essentially acknowledging that his friend QZ had repeatedly forged Babes's signature on banking documents purporting to come from Chase, Babes seemed unconcerned (and unsurprised).  Nor did Babes immediately notify his manager of the fraud that Chase had been facilitating against Plaintiffs.

104.    Chan explained to Babes that she had been unable to get in touch with QZ because he had been actively avoiding her and that she did not know how to contact Li, and therefore could not pursue the course of action to regain control of the WEAI and Bluestone corporate accounts that Babes had suggested.  Instead of offering an alternative course of action, or notifying his manager of the situation, Babes told Chan that he (Babes) would talk to QZ and then get back to her.

105.    Babes never followed up with Chan.

106.    Chan was unable to arrange any further meetings with QZ while in the United States, and returned to Hong Kong in mid-July 2023.

107.    While QZ refused to respond to any of Chan's WeChat messages, he did begin emailing Chan (from his q@sv.patten.edu email address).  In those emails, despite the events of July 2023, QZ continued to attempt to fraudulently conceal his and his accomplices' misconduct.  For example, on or about August 11, 2023, QZ represented to Chan over email that Patten University had merged with other educational institutions, that its student enrollment had greatly increased as a result, and that Bluestone's investment had actually tripled since 2021.  On information and belief, those representations too were false.

**Patten Holding Is QZ's Alter Ego**

108.    On information and belief, Defendant Patten Holding is, and at all relevant times was, an alter ego of Defendant QZ.

109.    Among other things, at all relevant times and on information and belief, QZ:

    (i)    commingled Patten Holding's funds with his own funds and those of other entities controlled by QZ, including (*inter alia*) Silicon Holding LLC, Napa Capital, Ltd., LINQ.ai, and Simmer Huang LLC;

    (ii)    treated the assets of Patten Holding as his own, using Patten Holding's funds for something other than Patten Holding's business;

    (iii)    held himself out to be personally liable for the debts of Patten Holding, including by promising to reimburse sums owed by Patten Holding to Plaintiffs directly or through other entities controlled by QZ;

    (iv)    failed to maintain minutes or adequate corporate records and/or confused the records of Patten Holding and other entities controlled by QZ;

    (v)    controlled the business and affairs of Patten Holding;

(vi)   used the same offices or business locations, including 201 Redwood Shores Pkwy., Redwood City, CA, for Patten Holding and other entities controlled by QZ;

(vii)  employed the same employees for Patten Holding and for other entities controlled by QZ, including an individual named Cheng Ma;

(viii) failed to adequately capitalize Patten Holding;

(ix)   used Patten Holding as a shell, instrumentality, or conduit for his own business and the business of other entities controlled by QZ;

(x)    concealed and misrepresented the identity of the responsible ownership, management, and financial interest of Patten Holding, as set forth in the foregoing allegations;

(xi)   disregarded legal formalities and failed to maintain arm's length relationships between Patten Holding and other entities controlled by QZ;

(xii)  diverted assets from Patten Holding to himself, to his accomplices, or to other entities controlled by QZ, as set forth in the foregoing allegations; and

(xiii) contracted with Plaintiffs with intent to avoid performance by use of the corporate entity as a shield against personal liability and/or otherwise used Patten Holding as a subterfuge of illegal transactions, as set forth in the foregoing allegations.

110.   Accordingly, on information and belief, there is such unity of interest and ownership between Patten Holding and QZ that the separate personalities of the corporation and the individual no longer exist and, if the acts are treated as those of the corporation alone, an inequitable result will follow.

**COUNT ONE**

**(Securities Fraud: 15 U.S.C. §§ 78j, 17 C.F.R. § 240.10b-5,**

**and Cal. Corp. Code § 25401)**

**(By All Plaintiffs Against Defendants QZ and Patten Holding)**

111.    Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

112.    By engaging in the acts and conduct alleged herein, Defendants QZ and Patten Holding violated § 10(b) of the 1934 Act and Rule 10b-5 in that they, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentality of interstate commerce, or of the mails, knowingly or with severe recklessness:

>   (i)    employed devices, schemes and artifices to defraud Plaintiffs;

>   (ii)    made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made not misleading, which operated as a fraud and deceit upon Plaintiffs in connection with the securities purchase agreements; and/or

>   (iii)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with the securities purchase agreements.

113.    By engaging in the acts and conduct alleged herein, Defendants QZ and Patten Holding violated Cal Corp. Code § 25401 in that they, directly or indirectly, in connection with an offer or sale of a security in California, by means of written or oral communications, knowingly made an untrue statement of material fact and/or omitted to state material facts necessary to make the statements made not misleading.

114.    Specifically, as set forth in the foregoing allegations, Defendant QZ made at least the following materially false or misleading statements to Plaintiffs:

>   (i)    false or misleading valuations in the PwC Valuation Analysis;

(ii)    false or misleading income statements in the HCVT Auditor's Report;

(iii)   false or misleading income statements in the Patten Income Statement;

(iv)   false or misleading operational and financial statements in the Patten University Due Diligence Report; and

(v)    false or misleading statements in the Patten-Stanford United College Stock Agreements.

115.    Similarly, as set forth in the foregoing allegations, Defendant Patten Holding made a myriad of materially false or misleading statements to Plaintiffs in the Patten-Stanford United College Stock Agreements.

116.    On information and belief, Defendants QZ and Patten Holding had actual knowledge of the materially false and misleading statements alleged herein, and intended thereby to deceive Plaintiffs.  Alternatively, Defendants QZ and Patten Holding acted with reckless disregard for the truth in that they recklessly failed to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, even though such facts were readily available to these Defendants.  Information showing that these Defendants acted knowingly or with reckless disregard for the truth is particularly within these Defendants' knowledge and control.

117.    Defendants QZ and Patten Holding made their materially false and misleading statements in connection with the purchase or sale of a security, namely shares in Patten Holding.  The purchase or sale of such shares was consummated between Plaintiff Bluestone and Defendant Patten Holding in the Bluestone Patten-Stanford United College Stock Agreements executed on July 6, 2021, and between Plaintiff WEAI and Defendant Patten Holding in the WEAI Patten-Stanford United College Stock Agreements executed on July 11, 2021.

118.    Plaintiffs reasonably relied on Defendants QZ and Patten Holding's materially false and misleading statements in deciding to enter into the Patten-Stanford United College Stock Agreements.

119.   Subsequent to their entry into the Patten-Stanford United College Stock Agreements, Plaintiffs suffered economic losses arising from Patten Holding's failure to consummate an initial public offering and its subsequent failure to redeem Plaintiff Bluestone shares in Patten Holding and/or return Bluestone and WEAI's investment funds (plus interest).

120.   Plaintiffs suffered these economic losses as a result of their reliance on Defendants QZ and Patten Holding's materially false or misleading statements.

121.   By reason of the foregoing, Defendants QZ and Patten Holding violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder, as well as Cal. Corp. Code § 25401.

122.   On information and belief, as alleged above, Defendant Patten Holding is Defendant QZ's alter ego and, therefore, these Defendants are jointly and severally liable for any violations of Section 10(b) of the 1934 Act, Rule 10b-5, and Cal. Corp. Code § 25401.

123.   Accordingly, Defendants QZ and Patten Holding are liable for having perpetrated securities fraud upon Plaintiffs.  Their liability includes but is not limited to disgorgement of all ill-gotten profits and damages, including consequential damages, in an amount to be proved at trial, as well as attorneys' fees, court costs, and foregone interest.

## <u>COUNT TWO</u>

### (Misrepresentation, Fraud, Fraud In Contract Formation)

### (By All Plaintiffs Against Defendants QZ and Patten Holding)

124.   Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

125.   Defendants QZ and Patten Holding intentionally misrepresented material information to Plaintiffs to induce them to enter into stock purchase agreements with, transfer funds to Patten Holding, and otherwise expend resources in pursuing the business opportunities that came with the Patten-Stanford United College.

126.    Specifically, as set forth in the foregoing allegations, Defendant QZ made at least the following materially false or misleading statements to Plaintiffs:

    (i)    false or misleading valuations in the PwC Valuation Analysis;

    (ii)    false or misleading income statements in the HCVT Auditor's Report;

    (iii)    false or misleading income statements in the Patten Income Statement;

    (iv)    false or misleading operational and financial statements in the Patten University Due Diligence Report;

    (v)    false or misleading statements in the Patten-Stanford United College Stock Agreements; and

    (vi)    false or misleading statements in the Stanford Agreements.

127.    Similarly, Defendant Patten Holding made a myriad of materially false or misleading statements to Plaintiffs in the Patten-Stanford United College Stock Agreements and in the Stanford Agreements.

128.    On information and belief, Defendants QZ and Patten Holding had actual knowledge of the falsity or misleading nature of the statements alleged herein, and intended thereby that Plaintiffs rely on those statements. Alternatively, Defendants QZ and Patten Holding acted with reckless disregard for the truth in that they recklessly failed to ascertain and disclose such facts as would reveal the false and misleading nature of the statements made, even though such facts were readily available to these Defendants.

129.    Plaintiffs reasonably relied on Defendants QZ and Patten Holding's false or misleading statements in deciding to enter into the Patten-Stanford United College Stock Agreements and to transfer funds to Patten Holding, as well as in deciding to expend resources to pursue the business opportunities that came with the Patten-Stanford United College.

130.    Plaintiffs were harmed by Patten Holding's failure to consummate an initial public offering and its subsequent failure to redeem Plaintiff Bluestone's shares in Patten

Holding and/or return Bluestone and WEAI's investment funds (plus interest), as well as its failure to proceed with the Patten-Stanford United College.

131.   Plaintiffs' reliance on Defendants QZ and Patten Holding's false or misleading statements caused that harm.

132.   On information and belief, as alleged above, Defendant Patten Holding is Defendant QZ's alter ego and, therefore, these Defendants are jointly and severally liable for any fraud perpetrated by either of them.

133.   Accordingly, Defendants QZ and Patten Holding are liable for having perpetrated a fraud upon Plaintiffs.  Their liability includes but is not limited to contract rescission, direct and consequential damages in an amount to be proved at trial, punitive damages, court costs, and foregone interest.

## COUNT THREE

### (Breach of Contract)

**(By Plaintiffs Bluestone and WEAI Against Defendants Patten Holding, QZ, and Patten University, In the Alternative)**

134.   Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

135.   On July 6, 2021, Plaintiff Bluestone entered into a valid, enforceable, and binding written contract with Defendants Patten Holding and Patten University, consisting of the Bluestone Patten-Stanford United College Stock Agreements.

136.   Similarly, on July 11, 2021, Plaintiff WEAI entered into a valid, enforceable, and binding written contract with Defendants Patten Holding and Patten University, consisting of the WEAI Patten-Stanford United College Stock Agreements.

137.   In their contract with Plaintiff Bluestone, Defendants Patten Holding and Patten University promised to, among other things, in the event they did not consummate an initial public offering within one year of funds being released to Defendant Patten Holding, "redeem a portion or all of the equity stake held by [Bluestone] at a per unit price

equal to the higher of (i) 200% of the per unit purchase price under this Agreement, as adjusted for stock split, stock combination, stock dividends and other recapitalization events, and (ii) the fair market value of a single unit, as determined by a third-party independent appraiser agreed to by the parties" within 30 days of Bluestone's request for such a redemption.

138.    Similarly, in its contract with Plaintiff WEAI, Defendants Patten Holding and Patten University promised to, among other things, in the event they did not consummate an initial public offering by July 31, 2022, pay the "entire outstanding principal balance and all unpaid accrued interest," at an annual rate of 9%.

139.    Plaintiffs substantially fulfilled their obligations under the contract by transferring funds to Defendant Patten Holding as agreed.

140.    Defendants Patten Holding and Patten University materially and substantially breached these contracts.  Specifically, these Defendants did not consummate an initial public offering within the time contemplated by the contracts, and they did not pay Plaintiffs pursuant to the parties' contractually agreed upon terms given Defendants Patten Holding and Patten University's failure to consummate an initial public offering.

141.    Defendants Patten Holding and Patten University's breaches caused Plaintiffs to sustain damages, both direct and consequential.

142.    On information and belief, as alleged above, Defendant Patten Holding is Defendant QZ's alter ego and, therefore, these Defendants are jointly and severally liable for any breach of contract.

143.    Accordingly, Defendants Patten Holding, Patten University, and QZ are liable for breach of contract.  Their liability includes but is not limited to direct and consequential damages in an amount to be proved at trial, attorneys' fees, court costs, and foregone interest.

1

**<u>COUNT FOUR</u>**

2

**(Receiving Stolen Property: Cal. Penal Code § 496)**

3

**(By All Plaintiffs Against Defendants QZ, Patten Holding, and Li)**

4          144.    Plaintiffs re-allege and incorporate by reference every allegation set forth in

5    the preceding paragraphs as though alleged in this Count.

6          145.    Through the fraudulent Patten-Stanford United College Scheme described

7    above, funds belonging to Plaintiffs were stolen or obtained by theft, by means of false or

8    fraudulent representations or pretenses.

9          146.    On information and belief, Defendants QZ, Patten Holding, and Li knew the

10   funds were stolen or obtained by theft.

11         147.    On information and belief, these Defendants received the stolen funds into

12   accounts under these Defendants' control.

13         148.    On information and belief, as alleged above, Defendant Patten Holding is

14   Defendant QZ's alter ego and, therefore, Defendants Patten Holding and QZ are jointly

15   and severally liable for any receipt of stolen property.

16         149.    Accordingly, Defendants QZ, Patten Holding, and Li are liable for receiving

17   stolen property pursuant to Penal Code § 496(c).  Their liability includes but is not limited

18   to direct and consequential damages in an amount to be proved at trial, treble damages,

19   punitive damages, attorneys' fees, court costs, and foregone interest.

20

**<u>COUNT FIVE</u>**

21

**(Conversion)**

22

**(By All Plaintiffs Against Defendants QZ, Patten Holding, and Li)**

23         150.    Plaintiffs re-allege and incorporate by reference every allegation set forth in

24   the preceding paragraphs as though alleged in this Count.

25         151.    Plaintiffs owned the funds that they invested in the Patten-Stanford United

26   College Scheme.

27

28

152.    By perpetrating the fraudulent scheme alleged above, Defendants QZ, Patten Holding, and Li substantially interfered with Plaintiffs' funds by taking possession of those funds, preventing Plaintiffs from having access to those funds, and/or refusing to return those funds after Plaintiffs demanded their return.

153.    Plaintiffs did not consent to these Defendants' having taken control of the funds that belong to Plaintiffs in this manner.

154.    These Defendants' conduct caused Plaintiffs harm, including in the loss of funds they invested.

155.    On information and belief, these Defendants engaged in this conduct with oppression, fraud, and/or malice within the meaning of Cal. Civil Code § 3294(c).

156.    Accordingly, Defendants QZ, Patten Holding, and Li are liable for their conversion of Plaintiffs' funds.  Their liability includes but is not limited to direct and consequential damages in an amount to be proved at trial, punitive damages, court costs, and foregone interest.

## **COUNT SIX**

### **(Aiding and Abetting Fraud; Conspiracy to Commit Fraud)**

### **(By All Plaintiffs Against Defendant Li)**

157.    Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

158.    On information and belief, Defendant Li knew that Defendants QZ and Patten Holding were defrauding Plaintiffs or, alternatively, was aware that Defendants QZ and Patten Holdings planned to defraud Plaintiffs.

159.    On information and belief, Defendant Li agreed with Defendants QZ and Patten Holding and intended that they defraud Plaintiffs.

160.    On information and belief, Defendant Li gave substantial assistance or encouragement to Defendants QZ and Patten Holding in their scheme to defraud Plaintiffs. Specifically, as set forth in the foregoing allegations, Defendant Li substantially assisted or

encouraged the Patten-Stanford United College Scheme at least by: (i) attempting to access Bluestone corporate account information at EWB; (ii) opening and then accessing and controlling a corporate bank account at Chase on Bluestone's behalf, knowing that she was not a duly authorized Bluestone corporate agent; and (iii) personally withdrawing funds from the corporate Bluestone Chase account.

161.    Defendant Li's conduct caused Plaintiffs harm, including in the loss of funds they invested.

162.    On information and belief, Defendant Li engaged in this conduct with oppression, fraud, and/or malice within the meaning of Cal. Civil Code § 3294(c).

163.    Accordingly, Defendant Li is liable for Defendants QZ and Patten Holding's having perpetrated a fraud upon Plaintiffs.  Her liability includes but is not limited to direct and consequential damages in an amount to be proved at trial, punitive damages, court costs, and foregone interest.

## COUNT SEVEN

### (Negligence)

### (By Plaintiffs Bluestone and WEAI Against Defendants Chase and Babes)

164.    Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

165.    As a bank to Plaintiffs Bluestone and WEAI, Defendant Chase owed Plaintiffs duties of care, including a duty to act with reasonable care in its transactions with its customers, a duty to act only in accordance with authorized instructions from authorized corporate representatives, and a duty to know its customers.  Defendant Chase further owed a duty to its customers, Plaintiffs Bluestone and WEAI, to establish and follow such procedures and business practices as are or may be reasonably necessary and effective to avoid a breach of any of the foregoing duties of care owed by Defendant Chase.

166.    As an employee of Defendant Chase and as a banker to Plaintiffs Bluestone and WEAI, Defendant Babes also owed Plaintiffs Bluestone and WEAI duties of care,

including a duty to act with reasonable care in transactions with these customers, a duty to act only in accordance with authorized instructions from authorized corporate representatives, and a duty to know these customers.  Defendant Babes further owed a duty to these Plaintiffs to follow such procedures and business practices as are or may be reasonably necessary and effective to avoid a breach of any of the foregoing duties of care, including to follow any such procedures and business practices reasonably established by Defendant Chase.

167.    As set forth in the foregoing allegations, on information and belief, Defendants Chase and Babes breached their duties to Plaintiffs Bluestone and WEAI in at least the following ways:

(i)    opening bank accounts for these Plaintiffs pursuant to instructions from unauthorized corporate representatives, either by failing to follow Defendant Chase's established procedures and business practices for business account opening (including, for example, by failing to request documents identifying authorized corporate representatives) or by failing to exercise due care in reviewing corporate documents (which would have revealed that none of the persons requesting account opening were authorized corporate representatives of Plaintiffs Bluestone or WEAI);

(ii)    following instructions from individuals (including Defendants QZ and Li) who were not authorized corporate representatives of Plaintiffs Bluestone or WEAI; and

(iii)    failing to establish or follow reasonable procedures and business practices for verifying the purpose of the accounts and/or transactions involving those accounts, the source of funds (including, for example, by failing to ask for the purpose of the account opening and various transactions – both incoming and outgoing – involving the accounts, failing to request supporting documentation, and/or failing to exercise due care in

reviewing that documentation), and for responding to information about potential fraud (such as documentation with forged signatures of Chase employee Babes).

168.    Not only did these actions or failures to act on Defendants Chase and Babes's part constitute a breach of their duties of care, but they also reflect a lack of any care or an extreme departure from what a reasonably careful bank or banker would do in the same situation to prevent harm to the bank and to its customers, evincing gross negligence by Defendants Chase and Babes.

169.    Defendants Chase and Babes's breaches caused Plaintiffs Bluestone and WEAI harm, including in the form of loss of funds they invested.

170.    Accordingly, Defendants Chase and Babes are liable to Plaintiffs Bluestone and WEAI for these Defendants' negligence.  Their liability includes but is not limited to direct and consequential damages in an amount to be proved at trial, court costs, and foregone interest.

## COUNT EIGHT

### (Aiding and Abetting Fraud; Conspiracy to Commit Fraud)

### (By All Plaintiffs Against Defendants Chase and Babes)

171.    Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

172.    On information and belief, Defendant Babes knew that Defendants QZ and Patten Holding were defrauding Plaintiffs or, alternatively, was aware that Defendants QZ and Patten Holding planned to defraud Plaintiffs.

173.    On information and belief, Defendant Babes agreed with Defendants QZ and Patten Holding and intended that they defraud Plaintiffs.

174.    On information and belief, Defendant Babes gave substantial assistance or encouragement to Defendants QZ and Patten Holding in their scheme to defraud Plaintiffs. Specifically, as set forth in the foregoing allegations, Defendant Babes substantially

assisted or encouraged the Patten-Stanford United College Scheme at least by: (i) assisting in the opening of the Bluestone and/or WEAI Chase accounts; (ii) facilitating those corporate account openings in contravention of Chase's policies and/or by turning a blind eye to the absence of any corporate representatives authorized to open (or, consequently, control and access) corporate bank accounts attending the in-person account opening process; (iii) making himself available by phone or in person to field questions from Plaintiffs related to their planned investment in the Patten-Stanford United College Scheme and the corporate accounts; and (iv) not acting upon receipt of information about potential fraud (such as documentation with his forged signatures).

175.    Defendant Babes's conduct caused Plaintiffs harm, including in the form of loss of funds they invested.

176.    Defendant Babes's acts of substantial assistance or encouragement, and/or the actions he took in furtherance of his agreement with Defendant QZ, were performed in his role as a banker employed by Defendant Chase, such that Defendant Babes was acting within the scope of his employment by Defendant Chase.

177.    Defendants Babes and Chase are thus jointly and severally liable for aiding and abetting Defendants QZ and Patten Holding's fraud or for conspiring with Defendants QZ and Patten Holding to perpetrate that fraud.

178.    Accordingly, Defendants Chase and Babes are liable for Defendants QZ and Patten Holding's having perpetrated a fraud upon Plaintiffs.  Their liability includes but is not limited to direct and consequential damages in an amount to be proved at trial, court costs, and foregone interest.

### COUNT NINE

**(Negligent Misrepresentation)**

**(By All Plaintiffs Against Defendants Sawyer and Ethan)**

179.    Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

180.    Defendants Sawyer and Ethan misrepresented material information to Plaintiffs that induced them to enter into the Patten-Stanford United College Stock Agreements and transfer funds to Patten Holding.

181.    Specifically, as set forth in the foregoing allegations, Defendants Sawyer and Ethan made a myriad of materially false or misleading statements to Plaintiffs in the Patten-Stanford United College Stock Agreements.  In addition, Defendant Sawyer made various materially false or misleading statements on Zoom meetings with Plaintiffs. Similarly, Defendant Ethan made various materially false or misleading statements in a November 4, 2020 email answering Plaintiffs' due diligence questions and on Zoom meetings with Plaintiffs.

182.    On information and belief, Defendants Sawyer and Ethan had no reasonable grounds for believing that the statements alleged herein were true, instead making them only at Defendant QZ's behest, intending thereby that Plaintiffs rely on those statements.

183.    Plaintiffs reasonably relied on Defendants Sawyer and Ethan's false or misleading statements in deciding to enter into the Patten-Stanford United College Stock Agreements and transfer funds to Patten Holding.

184.    Plaintiffs' reliance on Defendants Sawyer and Ethan's false or misleading statements caused harm to Plaintiffs, including in the form of loss of funds they invested.

185.    Accordingly, Defendants Sawyer and Ethan are liable for their negligent misrepresentations to Plaintiffs.  Their liability includes but is not limited to direct and consequential damages in an amount to be proved at trial, court costs, and foregone interest.

## COUNT TEN

### (Aiding and Abetting Fraud; Conspiracy to Commit Fraud)
### (By All Plaintiffs Against Defendants Sawyer and Ethan)

186.    Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

187.    On information and belief, Defendants Sawyer and Ethan knew that Defendants QZ and Patten Holding were defrauding Plaintiffs or, alternatively, were aware that Defendants QZ and Patten Holding planned to defraud Plaintiffs.

188.    On information and belief, Defendants Sawyer and Ethan agreed with Defendants QZ and Patten Holding and intended that they defraud Plaintiffs.

189.    Defendants Sawyer and Ethan gave substantial assistance or encouragement to Defendants QZ and Patten Holding in their scheme to defraud Plaintiffs.  Specifically, as set forth in the foregoing allegations, Defendant Sawyer substantially assisted or encouraged the Patten-Stanford United College Scheme at least by: (i) participating in various Zoom meetings with Plaintiffs about the purported investment opportunity; and (ii) executing the Patten-Stanford United College Stock Agreements.  Similarly, Defendant Ethan substantially assisted or encouraged the Patten-Stanford United College Scheme by (i) participating in various Zoom meetings with Plaintiffs about the purported investment opportunity; (ii) attending various in-person events put on by Patten University in China; (iii) sending Plaintiffs the Patten-Stanford United College Stock Agreements for execution via DocuSign; and (iv) executing the Patten-Stanford United College Stock Agreements.

190.    Defendants Sawyer and Ethan's conduct caused Plaintiffs harm, including in the form of loss of funds they invested.

191.    Accordingly, Defendants Sawyer and Ethan are liable for Defendants QZ and Patten Holding's having perpetrated a fraud upon Plaintiffs.  Their liability includes but is not limited to direct and consequential damages in an amount to be proved at trial, court costs, and foregone interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

A.    Awarding the amount of damages sustained by Plaintiffs as a result of Defendants' scheme to defraud Plaintiffs;

B.      Awarding the amount of interest guaranteed by the contracts Plaintiffs signed with Defendants;

C.      Awarding treble damages pursuant to Cal. Penal Code § 496;

D.      Awarding Plaintiffs their costs and attorneys' fees in connection with this action;

E.      Awarding punitive damages; and

F.      Such further and additional relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a jury trial on all issues and claims so triable.

DATED: June 27, 2025                    Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By;  */s/ James D. Judah*

James D. Judah
*Attorney for Plaintiffs*

COMPLAINT